**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

| | |
|---|---|
| MARIA MURPHY<br>3234 ROYAL FERN PLACE<br>ROCKVILLE, MD 20852<br><br>                    Plaintiff,<br><br>v.<br><br>BAYER HEALTHCARE<br>PHARMACEUTICALS, INC.<br>100 BAYER BLVD.<br>WHIPPANY, NJ 07981<br><br>BAYER PHARMA AG.<br>100 BAYER BLVD.<br>WHIPPANY, NJ 07981<br><br>                    Defendants. | Civil Action No. **23-cv-122**<br><br>**COMPLAINT AND**<br>**DEMAND FOR JURY TRIAL** |

**NATURE OF THE CASE**

Plaintiff Maria Murphy ("Plaintiff"), by her attorney William C. Brennan, Jr., brings this civil action for damages against Defendants Bayer Healthcare Pharmaceuticals, Inc., and Bayer Pharma AG (collectively, "Bayer" or "Defendants") for personal injuries caused by her use of the drug Betaseron®, an interferon beta-1b medication she was prescribed in 2002 to treat her multiple sclerosis.   Plaintiff used Betaseron® intermittently for 17 years. In 2020, Plaintiff was diagnosed with stage four kidney failure, requiring a life-saving kidney transplant. She was also diagnosed with Focal Segmental Glomerulosclerosis ("FSGS"), a disease in which scar tissue develops on the parts of the kidneys that filter waste out of the blood.   The nephrologist who evaluated Plaintiff's kidney failure, diagnosed Plaintiff with FSGS and determined her FSGS was caused by Betaseron®.

In this lawsuit, Plaintiff specifically alleges that Defendants failed adequately to warn that Betaseron® poses a significant risk of kidney dysfunction, including Nephrotic Syndrome, and FSGS. Plaintiff also alleges that Defendants failed to warn that patients at a heightened risk for kidney dysfunction and disease are more susceptible to developing the adverse nephrological effects of taking Betaseron® such that more vigilant monitoring of kidney function needs to occur. It is well known that members of the African-American population, of which Plaintiff is a member, have a higher risk of developing kidney dysfunction and disease than the general population.

Plaintiff alleges that Bayer knew that Betaseron® did, in fact, pose a serious risk of these nephrological side-effects, particularly in patients more susceptible to kidney dysfunction and disease, like African-Americans, but failed to warn consumers and healthcare professionals of same. Further, Bayer's label for Betaseron® misled consumers and healthcare practitioners into believing that Betaseron® was safe for patients, even patients or patient populations susceptible to kidney dysfunction and injury, worsening kidney function, or the development of FSGS, despite having knowledge of those risks and knowledge that kidney function may decline, requiring vigilant monitoring of kidney function and discontinuation of Betaseron® if kidney dysfunction develops during its use.

The warnings provided on Betaseron® labels in the European Union, Canada, United Kingdom, Australia and New Zealand, advise physicians to monitor kidney function for patients taking Betaseron® (called Betaferon abroad), advise of the risk of developing kidney disease, specifically Nephrotic Syndrome and FSGS, and advise physicians to discontinue prescribing Betaferon if kidney dysfunction develops. Defendants never put such warnings on the Betaseron® sold domestically, no doubt because they knew such a warning would decrease sales. Their refusal to do so was a direct and proximate cause of Plaintiff's injuries and damages.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and because of diversity of citizenship between the Plaintiff and the Defendants.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred where the Court is situated, and because personal jurisdiction exists over all Defendants.

3.      This Court has personal jurisdiction over Defendants because they conduct substantial business in the State of Maryland; have committed tortious conduct, in whole or in part, in the State of Maryland; have substantial and continuing contact in the State of Maryland; and derive substantial revenue from goods used and consumed within the State of Maryland. The Defendants actively sell, market, and promote their pharmaceutical product Betaseron® to physicians and consumers in Maryland on a regular and consistent basis.

## PARTIES

4.      Plaintiff, Maria Murphy, is an African-American resident of Potomac, Maryland. She has lived in Maryland for over 20 years.

5.      Defendant, Bayer Healthcare Pharmaceuticals Inc., is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 100 Bayer Boulevard, Whippany (Morris County), New Jersey, 07981.

6.      Defendant Bayer Pharma AG is a company domiciled in Germany and is the parent/holding company of Defendant Bayer Healthcare Pharmaceuticals, Inc. Bayer Pharma AG is a citizen of Germany.

7.      At all relevant times, Defendants transacted and conducted business in the State of

Maryland, and derived substantial revenue from interstate commerce.

8.      At all relevant times, Defendants expected or should have expected that its acts would have consequences within the United States and the State of Maryland.

9.      Upon information and belief, Defendant Bayer Pharma AG exercises dominion and control over Defendant Bayer Healthcare Pharmaceuticals, Inc.

10.     Upon information and belief, Defendant Bayer Pharma AG is the current owner of the trademark relating to Betaseron®.

## HISTORY OF BETASERON®

11.     Betaseron® was first developed by Berlex Laboratories, Inc. and Berlex, Inc. (collectively, "Berlex"), a subsidiary of Schering AG.   Berlex was integrated into Bayer HealthCare AG and operated as an integrated specialty pharmaceuticals business under the new name, Bayer Healthcare Pharmaceuticals, Inc.

12.     Upon information and belief, Betaseron's development was a joint venture between Schering AG's subsidiary Berlex Laboratories (acquired by Bayer in 2006 through its merger with Schering AG) and Chiron Corporation, created through a 1993 agreement covering the regulatory filing, development and supply of Betaseron.  Novartis acquired Chiron in 2006 and assumed its rights to Betaseron.  In 2007, Bayer Schering Pharma AG completed an agreement with Novartis transferring the remaining manufacturing and production rights and responsibilities of Betaseron® to Bayer Schering Pharma AG, including Novartis' manufacturing and production facilities in Emeryville, California.

13.     Since then, Defendants have been responsible for or involved in the manufacturing, producing, marketing, advertising, and distributing all Betaseron® sold by Defendant Bayer Healthcare Pharmaceuticals, Inc. in the United States and/or introduced into interstate commerce

throughout the United States, either directly or indirectly through third parties, subsidiaries or related entities.

14.     The FDA approved Betaseron's New Drug Application ("NDA") in July 1993.  In 2006, Betaseron® received authorization from the FDA for expanded usage by patients experiencing Clinical Isolation Syndrome ("CIS"), an acute onset of neurological symptoms that commonly progress into MS.  In 2019, authorization for Betaseron® was again expanded to include treatment for recurrent MS flare ups.

15.     Defendant Bayer Healthcare Pharmaceuticals, Inc. is the current holder of the NDA for Betaseron®.

16.     Defendants are in the business of designing, manufacturing, marketing, formulating, testing, packaging, labeling, producing, creating, making, constructing, assembling, advertising, and distributing prescription drugs, including the multiple sclerosis drug, Betaseron®.

17.     Defendants do business in the State of Maryland through the sale of Betaseron® and other prescription drugs in this state.

## FACTS

18.     Plaintiff incorporates by reference the Paragraphs numbered 1-17 as if fully set forth in detail herein.

### Plaintiff Maria Murphy Developed FSGS and Kidney Failure
### After 17 Years of Using Betaseron®

19.     Plaintiff Maria Murphy is a 58-year-old African-American female.

20.     On or around October 1999, Plaintiff was diagnosed with relapsing-remitting MS.

21.     On or around April 2002, Plaintiff was prescribed Betaseron® to treat her MS.

22.     In August 2002, Plaintiff relocated from California to Maryland and began treatment by Dr. Philip Pulaski at the Neurology Center in Washington, D.C. She also began seeing

Dr. Sandra Ginsberg as her primary care physician.

23.    Plaintiff continued taking Betaseron® as prescribed by her physicians until 2015.

24.    In 2015, Plaintiff's employer-sponsored insurance company required her to switch to Extavia (also an Interferon beta-1b drug), which she took as directed by her physician for approximately one year.

25.    In 2016, Plaintiff was notified by her insurance carrier that Betaseron® was now covered by her policy.  She resumed taking Betaseron® for the next four years until she was diagnosed with FSGS and kidney failure.

26.    Plaintiff and her healthcare providers relied on Defendants' representations regarding Betaseron® in its package insert, Patient Information Booklet, or otherwise disseminated by Defendants in deciding to use and prescribe Betaseron®.

27.    At no time did the Defendants warn either healthcare providers or patients of the adverse effects on kidney function when taking Betaseron®, including warning of the risks of developing kidney failure, Nephrotic Syndrome and FSGS.  Nor did the Defendants warn healthcare providers or patients that those patients more susceptible to kidney disease or dysfunction should be closely monitored for the development of Betaseron's adverse nephrological effects and to discontinue its use if kidney issues developed.

28.    Based on the instructions provided on the label, and her physician's directions, Ms. Murphy self-administered one vial of Betaseron® every other day.

29.    Plaintiff also regularly and timely saw her neurologist and primary care doctors for regular check-ups and monitoring of her liver function through regular blood tests, as recommended by the Betaseron® label.

30.    On or around February 2020, Plaintiff saw Dr. Ginsberg for a routine physical exam.

During that visit, she learned that her creatinine levels were elevated and that her urinalysis revealed elevated protein levels. Plaintiff was informed that her lab results revealed she had kidney function decline.  Dr. Ginsberg referred Plaintiff to Dr. Stephen Burka, a specialist in nephrology, for consultation regarding her decline in kidney function.

31.    The following week, Plaintiff saw Dr. Stephen Burka. Based on the lab reports provided by Dr. Ginsberg, Dr. Burka determined that Ms. Murphy was in stage four renal failure. Dr. Burka ordered additional lab work and a follow-up appointment the following week to determine the cause of her renal failure.

32.    At the follow-up appointment, Dr. Burka informed Plaintiff that she likely had FSGS, but would require a kidney biopsy to confirm the diagnosis.

33.    Plaintiff underwent a kidney biopsy in March 2020, which confirmed that she had FSGS and irreversible advanced stage kidney disease. Furthermore, follow up lab results revealed worsening kidney function.  Based on her degree of kidney failure and diagnosis of FSGS, Dr. Burka recommended that Ms. Murphy be evaluated for a kidney transplant.

34.    On or around May 2020, Plaintiff had an appointment with Dr. Reza Zonani, a nephrologist specializing in FSGS and renal diseases at Massachusetts General, in Boston, Massachusetts.  Based upon his evaluation, assessment and testing, Dr. Zonani concluded the cause of Plaintiff's FSGS was Betaseron®.

35.    After determining that Plaintiff's FSGS was caused by Betaseron, Dr. Zonani ordered that Plaintiff's Betaseron® use be discontinued.

36.    On or about December 22, 2020, Plaintiff was admitted to George Washington hospital, in Washington, DC, where she underwent a kidney transplant.

37.    As a result of Defendants' acts and omissions in failing to warn health care

providers and patients of the devastating renal complications that could occur with Betaseron® use, Ms. Murphy has been permanently injured and has incurred pain, suffering, emotional distress, loss of enjoyment of life, medical expenses, lost wages, and disability, as well as future pain, suffering, emotional distress, loss of enjoyment of life, disability, medical expenses, and diminished earning capacity. Further, as a result of requiring a kidney transplant, Ms. Murphy will suffer the fear of kidney rejection and the complications of life-time use of immunosuppressive drugs to reduce the risk of transplant rejection, including an increased risk for infections, an increased risk for diabetes, high blood pressure, cancer, and other risks associated with immunosuppressive therapy.

### *Betaseron's Label Fails to Warn of Kidney Risks to General Population and Even Higher Risk to Susceptible Populations including the African-American Population*

38.    Betaseron® is an Interferon beta-1b prescription drug used to treat relapsing forms of MS, including relapsing-remitting disease in adults, to reduce the frequency of clinical exacerbations.

39.    MS is a disease that triggers communication signals in the body's immune system to launch an inflammatory attack to the nervous system. Betaseron®'s active agent, Interferon beta-1b, is a signaling protein produced by immune cells to communicate and reduce the inflammatory immune response.

40.    Betaseron® is administered subcutaneously, via single use vial or prefilled syringe, injected under the skin by a healthcare professional or by the patient as instructed by their physician. The recommended starting dose is 0.0625 mg subcutaneously every other day, with dose increases over a six-week period to the recommended dose of 0.25 mg every other day.

41.    From the time of Betaseron's® FDA approval in 1993 until the present, the product

label has failed to provide any warning regarding significant renal dysfunction or disease, Nephrotic Syndrome or FSGS for patients taking Betaseron® in the United States.

42.    Further, Betaseron®'s labeling information fails to warn healthcare providers and patients that patients more susceptible for renal disease are at a higher risk for development of renal dysfunction and disease, Nephrotic Syndrome or FSGS from Betaseron® use.

43.    One of the most important purposes of a drug's label is to provide warnings and precautions to healthcare providers and patients about the possible risks of a particular drug so that appropriate monitoring can be conducted during treatment for the development of those risks.

44.    Betaseron®'s label in the United States does not warn patients of the risk of developing renal dysfunction or disease, such as Nephrotic Syndrome or FSGS.  Nor does the label warn healthcare providers or patients of the need to vigilantly monitor for such risks, especially in patients more susceptible to such conditions, like the African-American population, or recommend discontinuation of Betaseron® if kidney dysfunction or disease develops.

45.    Nephrotic syndrome and FSGS are diseases in which scar tissue develops on the glomeruli, the small parts of the kidneys that filter waste from the blood.

46.    Betaseron's® United States label fails to mention of any risk of developing significant renal dysfunction or disease, such as Nephrotic Syndrome and FSGS. This, despite a known causal or associated risk between Betaseron® and the development of renal dysfunction and disease, Nephrotic Syndrome, and FSGS.

47.    The label for Betaseron® sold in the United States varies significantly from the label for Bayer's Interferon beta-1b drugs marketed and sold in European Union countries, United Kingdom, Canada, New Zealand, and Australia.

48.    In the European Union, for example, Betaferon® (Bayer's Interferon beta-1b trade

name in the European Union) contains specific warnings and precautions regarding the risk of developing Nephrotic Syndrome, including FSGS. The European Medicines Agency ("EMA") regulates medicines manufactured and distributed among the European Union members. Specifically, the EMA product information developed, disseminated and published by the Defendants contains "Special warnings and precautions for use" regarding Betaferon, including the following:

"Nephrotic Syndrome

Cases of nephrotic syndrome with different underlying nephropathies including collapsing focal segmental glomerulosclerosis (FSGS), minimal change disease (MCD), membranoproliferative glomerulonephritis (MPGN) and membranous glomerulopathy (MGN) have been reported during treatment with interferon beta products. Events were reported at various time points during treatment and may occur after several years of treatment with interferon beta.  Periodic monitoring of early signs or symptoms, e.g. oedema, proteinuria and impaired renal function is recommended, especially in patients at higher risk of renal disease.  Prompt treatment of nephrotic syndrome is required and discontinuation of treatment with Betaferon should be considered."

49.    The development of Nephrotic Syndrome, including FSGS, was identified by Defendants during post-marketing surveillance, highlighting the need of drug companies to remain vigilant in identifying adverse reactions after products have been approved for sale and to amend their labeling to include such adverse drug reactions discovered during post-marketing pharmacovigilance.

50.    Similar to Defendants' label in the European Union, in Canada the product monograph for Betaseron® includes the same precaution regarding the development of nephrotic syndrome (and FSGS) that was on the drug's label in European Union member countries.

51.    Likewise, the same warnings and precautions concerning Betaseron® in New Zealand, the United Kingdom, and Australia concerning the risks associated with Betaseron, which

were identified in the post marketing surveillance of Defendants' product.

52.    However, despite post marketing surveillance of Defendants' interferon beta-1b product in the European Union, Canada, United Kingdom, Australia, and New Zealand identifying the risk of developing nephrotic syndrome (including FSGS), Betaseron®'s label in the United States fails to identify the risk of Nephrotic Syndrome, including FSGS, thereby depriving healthcare providers and patients of vital information for monitoring and protecting their patients' health.

53.    Once the FDA has approved a drug such as Betaseron, Defendants were obligated to perform post-approval/post marketing surveillance for the development of adverse drug reactions not identified during clinical trials and update the label accordingly to appropriately advise healthcare providers and patients of risks associated with their drug so permanent and irreversible injury can be avoided.

54.    Defendants failed to update their label or advise the FDA of the need to update the label to add a warning regarding the heightened risk to the general population of developing nephrotic syndrome, including FSGS, from using Betaseron.

55.    Defendants also failed to warn of the heightened risk of developing kidney dysfunction and disease in patient populations more susceptible to their development like the African-American population.  It is well-known that African-Americans are at a significantly higher risk of developing renal dysfunction and disease than the general population and almost four times as likely as whites to develop renal dysfunction and disease.

56.    Patients with FSGS that develop Nephrotic Syndrome typically develop symptoms of urine protein-creatine and renal insufficiency that can lead to renal failure, requiring a kidney transplant or dialysis to stay alive. Symptoms may include swelling in various body parts, weight

gain due to extra fluid in the body, foamy urine caused by high protein levels in the urine, high cholesterol, and low levels of protein in the blood. Physicians can monitor a patient with FSGS who have a risk of developing kidney failure by conducting a blood or urine test or a kidney biopsy.

57.    Healthcare providers who are not warned of the need to vigilantly monitor patients taking Betaseron, may result in irreversible injury to the kidney, requiring kidney transplantation or dialysis to stay alive.

58.    It has been estimated that approximately 7 people per million in the general population have FSGS, accounting for about 40% of adults with nephrotic syndrome. FSGS occurs more commonly in African-Americans and the rate of decline of kidney function is generally more rapid in African-Americans.

59.    Betaseron®, an interferon beta-1b drug, is known and was known by the Defendants to be associated with renal failure and nephrotic syndrome, including FSGS. Defendants' failure to include such a warning in Betaseron®'s labeling is misleading and inadequate, especially for African-Americans who have a higher risk of developing FSGS after treatment with interferon beta-1b.

60.    Betaseron's® label is insufficient, inadequate, and inaccurate, as it fails to inform healthcare practitioners and patients of the full scope of the risks of the product by omitting any warning information of risk to developing kidney problems, including   nephrotic syndrome and FSGS.

61.    Defendants' actions have misled consumers and healthcare practitioners into believing that Betaseron® is safe for patients, even those more susceptible to renal dysfunction and disease, including patients at risk of developing nephrotic syndrome and FSGS, despite having clear knowledge of those risks.

62.    Not only is the product label misleading but Defendants also used direct-to-consumer advertising in the form of Facebook ads, and a patient website, as well as other video or audio clips to market Betaseron®, and none which warned of the drug's risks of renal dysfunction or disease, Nephrotic Syndrome, or FSGS.

63.    For example, Defendants' website for Betaseron®, which both patients and healthcare practitioners are encouraged to visit, provides no warning or safety information to consumers that Betaseron® can cause renal dysfunction or disease, Nephrotic Syndrome, or FSGS.

64.    Defendants, by their acts and omissions, have failed in their responsibility to Plaintiff and to other patients taking Betaseron® to include warnings about the potential for renal dysfunction, nephrotic syndrome, and FSGS.

65.    As a result of Defendants' acts and omissions regarding Betaseron®'s propensity to cause renal dysfunction and nephrotic syndrome, Plaintiff and her healthcare providers were not informed of such risks so that Plaintiff could be appropriately monitored and Betaseron® discontinued before permanent injury occurred, leading to her need for a kidney transplant.

## COUNT I
## FAILURE TO WARN
## (STRICT LIABILITY)

66.    Plaintiff incorporates by reference Paragraphs 1-65 of the Complaint as if fully set forth in detail herein.

67.    Defendants manufactured, designed, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, distributed and sold, and otherwise released into the stream of commerce the pharmaceutical Betaseron®, and in the course of same, directly advertised or marketed the product to consumers or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of Betaseron®.

68.    Defendants knew or should have known that Betaseron® could cause, and/or contribute to the development of renal   disease, including Nephrotic Syndrome and FSGS.

69.    Defendants failed to adequately warn that Betaseron® causes and/or contributes to the development of renal dysfunction, renal disease, nephrotic syndrome or FSGS.

70.    Defendants failed to warn patients, physicians, the healthcare community, and the public at large within the United States of the risks associated with Betaseron®.

71.    Defendants knew or should have known that patients at higher risk for developing renal dysfunction and disease, and nephrotic syndrome, including African-Americans placed such patients at an even higher risk of adverse renal dysfunction and disease if taking Betaseron®.

72.    Defendants failed to warn patients, physicians, the healthcare community, and the public at large within the United States that patients at higher risk for developing renal dysfunction and disease, including nephrotic syndrome and FSGS, were more susceptible to the adverse renal effects of taking Betaseron®.

73.    Likewise, Defendants knew or should have known that use of Betaseron® should

14

be discontinued immediately once a patient manifests signs or symptoms of renal dysfunction while taking Betaseron® to avoid permanent renal injuries and damages.

74.    Defendants did not disclose a dangerous condition regarding its Betaseron®, namely, that Betaseron® can cause or substantially contribute to the development of renal dysfunction and disease, including nephrotic syndrome and FSGS in patients generally or those at higher risk of renal disease.

75.    In fact, Defendants specifically knew and warned healthcare providers and patients in the European Union, Canada, the United Kingdom, Australia and New Zealand of the risk of renal dysfunction and disease, including the risk of nephrotic syndrome and FSGS, but failed to provide those warnings to healthcare providers and patients in the United States.

76.    Betaseron® was under the exclusive control of Defendants and was unaccompanied by appropriate warnings regarding all of the risks associated with its use.  The warnings did not accurately reflect the risk, incidence, symptoms, scope or severity of such injuries to the consumer or physicians, including the increased risk of developing renal disease, nephrotic syndrome or FSGS.

77.    Even though Defendants knew or should have known of the risks associated with Betaseron®, they failed to provide warnings that accurately reflected the signs, symptoms, incident, scope, or severity of the risks associated with the product.

78.    Plaintiff used Betaseron® as intended and as indicated by the package labeling in a reasonably foreseeable manner.

79.    Plaintiff could not have discovered the risk of significant renal disease, including Nephrotic Syndrome or FSGS from taking Betaseron® through the exercise of reasonable care.

80.    Defendants, as manufacturers of pharmaceutical drugs, are held to the level of

knowledge of an expert in the field and, further, Defendants had post-marketing knowledge of the dangerous risks and side effects of Betaseron®, including the risks of developing nephrotic syndrome and FSGS.

81.    Plaintiff did not have the same knowledge as Defendants and no adequate warning was communicated to her physician(s).

82.    Plaintiff and her healthcare practitioners relied upon the Defendants' representations regarding Betaseron® in the package insert, Patient Information Booklet, the official Betaseron® website, or otherwise disseminated by the Defendants.

83.    Defendants had a continuing duty to warn consumers, including Plaintiff and her physicians, and the medical community, of the dangers associated with Betaseron®, and by negligently and/or wantonly failing to adequately warn of the dangers associated with its use, Defendants breached their duties to Plaintiff.

84.    Although Defendants knew, or should have known, of the defective nature of Betaseron®, they continued to manufacture, design, formulate, package, label, produce, create, make, construct, assemble, market, advertise, distribute and sell Betaseron® without providing adequate warnings and instructions concerning the use of Betaseron® so as to maximize sales and profits at the expense of the public health and safety, in knowing, conscious, and deliberate disregard of the foreseeable harm caused by Betaseron®.

85.    As a direct and proximate result of Defendants' wrongful conduct these wrongful acts or omissions of the Defendants, Plaintiff has been permanently injured, required a kidney transplant secondary to the development of FSGS, has incurred or will incur past and future medical expenses, has experienced or will experience past and future pain and suffering, has incurred or will incur lost wages, and is subject to an increased risk of future harm.

86.     Plaintiff demands judgment against Defendants for compensatory, statutory and punitive damages, together with interest, costs of suit, attorneys' fees and all other such relief as the Court deems appropriate pursuant to the common law and statutory law.

## COUNT II
## FAILURE TO WARN
## (NEGLIGENCE)

87.     Plaintiff incorporates by reference Paragraphs 1-86 of the Complaint as if fully set forth in detail herein.

88.     Defendants manufactured, designed, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, distributed and sold, and otherwise released into the stream of commerce the pharmaceutical Betaseron®, and in the course of same, directly advertised or marketed the product to consumers or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of Betaseron®.

89.     Defendants knew or should have known that Betaseron® caused and/or contributed to the development of kidney disease, Nephrotic Syndrome, and FSGS.

90.     Defendants were aware of the risks Betaseron® posed to patients as it warned of the exact risk that Plaintiff experienced in other countries.

91.     Specifically, Defendants including a warning in the Betaseron/Betaferon product labels in the European Union Countries, Canada, the United Kingdom, Australia and New Zealand of the risk of kidney problems and advises patients and their doctors to discontinued use if kidney problems develop.

92.     Despite the foregoing, Defendants failed to warn patients, physicians, the healthcare community, and the public at large within the United States of the risks associated with Betaseron®, including that use of Betaseron® causes, contributes to, and/or triggers the

development of Nephrotic Syndrome and FSGS.

93.     Likewise, Defendants knew or should have known that use of Betaseron® should be discontinued immediately once a patient is experiencing kidney dysfunction or signs of kidney disease, but made no effort to warn patients, physicians, the healthcare community, or the American public of this potentially lifesaving information.

94.     Betaseron®'s labeling fails to adequately warn consumers and prescribers of, among other things, the increased risk of developing kidney disease, Nephrotic Syndrome, and FSGS.

95.     Betaseron® was under the exclusive control of Defendants and was unaccompanied by appropriate warnings regarding all of the risks associated with its use.  The warnings did not accurately reflect the risk, incidence, symptoms, scope or severity of such injuries to the consumer or physicians, including the increased risk of developing renal disease, Nephrotic Syndrome, or FSGS.

96.     Defendants downplayed the serious and dangerous side effects of Betaseron® to encourage sales of the product; consequently, Defendants placed profits above their customers' safety.

97.     Betaseron® contained warnings insufficient to alert Plaintiff or her doctor to the dangerous risks and reactions associated with it.  Even though Defendants knew or should have known of the risks associated with Betaseron® to patients in the United States, they failed to provide warnings that accurately reflected the signs, symptoms, incident, scope, or severity of the risks associated with the product.

98.     Plaintiff used Betaseron® as intended and as indicated by the package labeling in a reasonably foreseeable manner.

99.    Plaintiff could not have discovered the risk of developing kidney disease, Nephrotic Syndrome or FSGS from Betaseron® use through the exercise of reasonable care.

100.    Defendants, as manufacturers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field and, further, Defendants had knowledge of the dangerous risks and side effects of Betaseron®, including the risks of developing kidney disease, Nephrotic Syndrome, and FSGS.

101.    Plaintiff did not have the same knowledge as Defendants and no adequate warning was communicated to her physician(s).

102.    Plaintiff and her healthcare practitioners relied upon Defendants' representations regarding Betaseron® in the package insert, Patient Information Booklet, the official Betaseron® website, and/or other information disseminated by the Defendants.

103.    As an African-American, Plaintiff is at high risk for developing FSGS when using an interferon beta-1b drug such as Betaseron®, and susceptible populations were not warned of the need to monitor her kidney function when using the drug.

104.    Defendants had a continuing duty to warn consumers, including Plaintiff and her physicians and the medical community, of the dangers associated with Betaseron®.  By negligently and/or wantonly failing to adequately warn of the dangers associated with its use, Defendants breached their duties.

105.    Although Defendants knew of the dangerous of Betaseron®, they continued to manufacture, design, formulate, test, package, label, produce, create, make, construct, assemble, market, advertise, distribute and sell Betaseron® without providing adequate warnings and instructions concerning the use of Betaseron®  so as to maximize sales and profits at the expense of the public health and safety, in knowing, conscious, and deliberate disregard of the foreseeable

harm caused by Betaseron®.

106.    As a direct and proximate result of one or more of these wrongful acts or omissions of the Defendants, Plaintiff has been permanently injured and has incurred or will incur past and future medical expenses, has experienced or will experience past and future pain and suffering, has incurred or will incur lost wages, and is subject to an increased risk of future harm.

107.    Plaintiff demands judgment against Defendants for compensatory, statutory and punitive damages, together with interest, costs of suit, attorneys' fees and all other such relief as the Court deems appropriate pursuant to the common law and statutory law.

## REQUEST FOR PUNITIVE DAMAGES

108.    Plaintiff incorporates by reference Paragraphs 1-65 of the Complaint as if fully set forth in detail herein.

109.    At all times relevant herein, Defendants:

    a.  knew that Betaseron® posed a risk to patients' renal function, including the risk of Nephrotic Syndrome and FSGS;

    b.  concealed the dangers and health risks from Plaintiff, physicians, other medical providers, and the American public at large;

    c.  made misrepresentations to Plaintiff, her physicians, hospitals, medical providers, and the public at large as previously stated herein as to the safety of Betaseron®; and

    d.  with full knowledge of the health risks associated with Betaseron® and without adequate warnings of the same, manufactured, designed, formulated, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, distributed and sold Betaseron® for use.

110.    Defendants, by and through officers, directors, managing agents, authorized sales representatives, employees and/or other agents who engaged in conscious and deliberate conduct toward Plaintiff and the public, and acted in bad faith for the safety of Plaintiff and the public at large.

111.    Defendants consciously and deliberately disregarded the foreseeable harm resulting from their acts and omissions.

112.    Defendants had actual knowledge of Betaseron®'s propensity to cause renal injury and disease, including Nephrotic Syndrome and FSGS, but Defendants failed to, and continue to fail to, adequately warn about the risks of Betaseron.  Defendants made the conscious decision to not include a warning in the United States regarding the serious and dangerous side effects of Betaseron® to encourage sales of the product; consequently, Defendants placed profits above their customers' safety.

113.    Plaintiff's injuries are a result of an evil motive, intent, reckless disregard of Plaintiff's safety on the part of the Defendants.

114.    As a direct and proximate result of one or more of these wrongful acts or omissions of the Defendants, Plaintiff is entitled to a recovery of punitive damages.

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civil Pro. 38 Plaintiff demands a jury trial on all issues trial of right by a jury.

**WHEREFORE,** Plaintiff demands judgment against the Defendants and requests:

a.   A trial by jury;

b.   Judgment against Defendants for all compensatory damages in excess of $75,000.00, exclusive of interest and costs and punitive damages allowable to Plaintiff;

c.  Judgment against Defendants for all other relief sought by Plaintiff under this Complaint;

d.  An order for all costs and attorneys' fees; and

e.  Such further relief which the Court deems just and appropriate.

Respectfully submitted,

*W. C. Brennan, Jr.*

William C. Brennan, Jr., *local counsel*
Brennan McKenna & Lawlor, Chtd.
Bar Number: 00465
6305 Ivy Lane, Suite 700
Greenbelt, MD 20770
301.474.0044 (telephone number)
301.474.5730 (facsimile number)
wbrennan@brennanmckenna.com (email)

*Counsel for Plaintiff*