**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **MARIA MURPHY,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civ. No. DLB-23-0122** |
| **BAYER HEALTHCARE** | * | |
| **PHARMACEUTICALS INC.,** | * | |
| **Defendant.** | | |

**MEMORANDUM OPINION**

For seventeen years, Maria Murphy took Betaseron® to treat her relapsing-remitting multiple sclerosis ("MS"). Murphy developed kidney failure and scar tissue on the part of her kidneys that filters blood. A physician determined that this scar tissue was caused by Betaseron®. Murphy sued Bayer Healthcare Pharmaceuticals, Inc. ("Bayer"), the manufacturer of Betaseron®, alleging the company failed to adequately warn her and her health care providers about the risk of kidney malfunction and kidney disease associated with use of the drug.

Bayer moved to dismiss Murphy's complaint for failure to state a claim. Bayer asserted that Murphy's state law claims should be dismissed on federal preemption grounds. The Court denied the motion. Bayer now moves for reconsideration or, in the alternative, requests that the Court certify for interlocutory appeal its Order denying the motion to dismiss. For the following reasons, the Court denies Bayer's motion for reconsideration and its request to certify for interlocutory appeal the Order denying the motion to dismiss.

## I.    Background

### A.  Murphy's Complaint

Murphy, an African American woman, was diagnosed with relapsing-remitting MS around 1999.[1] ECF 1, ¶¶ 19–20. MS prompts the body's immune system to attack the nervous system. *Id.* ¶ 39. On or around April 2002, Murphy was prescribed a drug called Betaseron® to treat her MS. *Id.* ¶ 21. Betaseron® is an Interferon beta-1b prescription drug that reduces the body's inflammatory immune response and lessens clinical exacerbations. *Id.* ¶¶ 38–39. Murphy took Betaseron® almost exclusively from 2002 until 2020. *Id.* ¶¶ 21, 23–25. She took a different Interferon beta-1b drug between 2015 to 2016 due to a change in her insurance coverage. *Id.* ¶¶ 24–25. She self-administered one vial of the drug every other day per the instructions of her physician and the Betaseron® label. *Id.* ¶ 28. Murphy also adhered to the label's recommendation to get regular check-ups with her providers and to undergo regular blood tests to monitor her liver function. *Id.* ¶ 29.

Around February 2020, Murphy's primary care physician, Dr. Sandra Ginsberg, identified a decline in Murphy's kidney function and referred her to a specialist, Dr. Stephen Burka. *Id.* ¶¶ 22, 30. Dr. Burka diagnosed Murphy with stage four renal failure. *Id.* ¶ 31. A biopsy confirmed that she had focal segmental glomerulosclerosis ("FSGS")—a disease where scar tissue develops on the kidneys—and irreversible advanced-stage kidney disease. *Id.* ¶¶ 32–33, 45. Due to the FSGS diagnosis and her worsening kidney function, Dr. Burka recommended that Murphy get an evaluation for a kidney transplant. *Id.* ¶ 33. Murphy underwent a kidney transplant later that year. *Id.* ¶ 36. Another specialist, Dr. Reza Zonani, determined the cause of Murphy's FSGS: the Betaseron®. *Id.* ¶ 34. Dr. Zonani discontinued Murphy's use of the drug. *Id.* ¶ 35.

---

[1] The well-pleaded factual allegations in Murphy's complaint are accepted as true.

Bayer is a Delaware corporation with a principal place of business in New Jersey. *Id.* ¶ 5. Bayer designs, manufactures, and markets prescription drugs, including Betaseron®. *Id.* ¶ 16. The company currently holds the Betaseron® New Drug Application ("NDA"), approved by the Food and Drug Administration ("FDA") in 1993. *Id.* ¶¶ 14–15. In 2006, the FDA authorized the drug's expanded use for Clinical Isolation Syndrome, an onset of neurological symptoms that commonly progress into MS. *Id.* ¶ 14. In 2019, the FDA approved a subsequent expansion for Betaseron® to treat recurrent MS flare-ups. *Id.* Today, Betaseron® is used to treat relapsing forms of MS, including relapsing-remitting MS, to limit the frequency of clinical exacerbations. *Id.* ¶ 38. Since its approval in 1993, the Betaseron® product label has not warned patients in the United States of significant renal disease or dysfunction, Nephrotic Syndrome, or FSGS; nor has it explained that patients who are more susceptible to renal disease, including African American patients, face a higher risk of developing these conditions. *Id.* ¶¶ 41, 44, 58. The Betaseron® label in the United States also does not caution patients or providers to monitor for the risks of renal dysfunction or disease associated with taking the drug, such as Nephrotic Syndrome or FSGS, and it does not recommend discontinuing the drug if the patient develops kidney problems. *See id.* ¶ 44.

Murphy alleges that renal failure, Nephrotic Syndrome, and FSGS are known risks associated with Betaseron® and that Bayer knew of these risks. *Id.* ¶¶ 46, 59. Bayer's post-marketing surveillance identified the risks of developing Nephrotic Syndrome, including FSGS. *Id.* ¶ 49. In Canada, the European Union, the United Kingdom, New Zealand, and Australia, the Betaseron® label includes warnings about the risk of developing Nephrotic Syndrome, including FSGS. *Id.* ¶¶ 47–48, 50–51, 75. For example, the label in the European Union warns that, among other things, "[c]ases of nephrotic syndrome with different underlying nephropathies including collapsing [FSGS] . . . have been reported during treatment with interferon beta products." *Id.* ¶ 48.

The Betaseron® European Union label also recommends monitoring for early signs and symptoms of Nephrotic Syndrome. *Id.*

Murphy asserts two failure-to-warn claims under state law against Bayer: one for strict liability and one for negligence.[2] *Id.* ¶¶ 66–107. Murphy alleges that Bayer was required to conduct post-approval surveillance of adverse drug reactions and did not fulfill its obligation to update the Betaseron® label to identify risks, including FSGS and the heightened risk of kidney dysfunction and disease in the African American population. *Id.* ¶¶ 53–55, 60–61. According to Murphy, Bayer also used direct-to-consumer advertising without warning of these risks. *Id.* ¶¶ 62–63. She further alleges that health care providers are not warned about the need to monitor patients. *Id.* ¶¶ 56–57, 60–61. Murphy says that she and her health care providers relied on Bayer's representations, that she used Betaseron® in a reasonably foreseeable manner, and that she could not have discovered the risk of developing renal disease such as FSGS through the exercise of reasonable care. *Id.* ¶¶ 79, 82.

Murphy alleges that she "has been permanently injured and has incurred pain, suffering, emotional distress, loss of enjoyment of life, medical expenses, lost wages, and disability, as well as future pain, suffering, emotional distress, loss of enjoyment of life, disability, medical expenses, and diminished earning capacity." *Id.* ¶ 37. She seeks damages, attorneys' fees, and costs. *Id.* at 21–22.

### B.  Bayer's Motion to Dismiss and Motion for Reconsideration

On September 15, 2023, Bayer moved to dismiss Murphy's complaint for failure to state a claim. *See* ECF 42. Bayer argued that Murphy's state-law claims were preempted by federal law.

---

[2] Murphy also named as a defendant Bayer Pharma AG, a German company with no presence in the United States. The Court dismissed the claims against Bayer Pharma AG for lack of personal jurisdiction on August 14, 2024. *See* ECF 62.

*See id.*; *see also* ECF 42-1, at 11–18. Bayer explained that federal law prohibits changes to the Betaseron® label without FDA approval except through the "changes being effected" ("CBE") regulation. The CBE regulation allows drug manufacturers to unilaterally "add or strengthen a . . . warning" on a drug's physician label based on "newly acquired information" regarding "evidence of a causal association" between the drug and a risk of harm. 21 C.F.R. § 314.70(c)(6)(iii). Bayer argued that Murphy has not plausibly alleged that Bayer could update the warnings on its Betaseron® label because she did not allege "newly acquired information" concerning "evidence of a causal association" between Betaseron® and a risk of harm. Without allegations in the complaint that showed Bayer could update the label without FDA approval, Bayer argued Murphy's state law claims were preempted by federal law and must be dismissed.

The Court denied Bayer's motion to dismiss. During an August 14, 2024 hearing, the Court explained that federal preemption is an affirmative defense, and under Fourth Circuit law, Murphy was not required to "plead affirmatively in h[er] complaint matters that might be responsive to affirmative defenses even before the affirmative defenses are raised." *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 466 (4th Cir. 2007) (en banc); *see also Burrell v. Bayer Corp.*, 918 F.3d 372, 382 n.3 (4th Cir. 2019) ("It is well established, of course, that preemption is an affirmative defense. The burden of establishing preemption, in other words, is on the defendant; plaintiffs . . . are not required to establish, nor to allege in their complaints, that their claims are *not* preempted.").

Bayer timely moved for reconsideration or, in the alternative, requested that the Court certify its Order for interlocutory appeal under 28 U.S.C. § 1292(b). ECF 68 & 68-1. Bayer also filed an answer to Murphy's complaint, in which it raised the affirmative defense of federal preemption. ECF 69, at 22–23. Murphy opposed Bayer's motion for reconsideration and request

for interlocutory appeal. ECF 70. Bayer replied. ECF 73. No hearing is necessary. Loc. R. 105.6

(D. Md. 2023).

## II.    Standard of Review

Federal Rule of Civil Procedure 54(b) provides that "any order . . . that adjudicates fewer

than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at

any time before the entry of a judgment adjudicating all the claims and all the parties' rights and

liabilities." Fed. R. Civ. P. 54(b). Under Rule 54(b)—as compared to Rules 59(e) and 60(b), which

govern challenges to final judgments—the Court has "broader flexibility to revise *interlocutory*

orders before final judgment as the litigation develops and new facts or arguments come to light."

*U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Va., LLC*, 899 F.3d 236, 256 (4th Cir. 2018)

(quoting *Carlson v. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017)).

The Court's discretion under Rule 54(b), however, "is not limitless" and "is 'subject to the

caveat that where litigants have once battled for the court's decision, they should neither be

required, nor without good reason permitted, to battle for it again.'" *Id.* at 256–57 (first quoting

*Carlson*, 856 F.3d at 325; and then quoting *Off. Comm. of the Unsecured Creditors of Color Tile,*

*Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003)). Accordingly, the Court may

revise a prior order "under the same circumstances in which it may depart from the law of the case:

(1) a subsequent trial producing substantially different evidence; (2) a change in applicable law;

or (3) clear error causing manifest injustice." *Id.* at 257 (quoting *Carlson*, 856 F.3d at 325). "This

standard closely resembles the standard applicable to motions to reconsider final orders pursuant

to Rule 59(e), but it departs from such standard by accounting for potentially different evidence

discovered during litigation as opposed to the discovery of new evidence not available at trial." *Id.*

(quoting *Carlson*, 856 F.3d at 325).

### III.    Discussion

#### A.  Motion for Reconsideration

Bayer moves for reconsideration of the Court's August 14, 2024 Order denying its motion to dismiss Murphy's complaint for failure to state a claim. In support of its motion, Bayer does not cite a change in applicable law or new evidence. Instead, Bayer argues that the Court clearly erred when it held that Murphy does not need to plead the existence of "newly acquired information" in anticipation of Bayer's affirmative defense of federal preemption. The Court did not err. Bayer's motion for reconsideration is denied.

In the Fourth Circuit, "a motion to dismiss filed under Federal Rule of [Civil] Procedure 12(b)(6), which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense." *Goodman*, 494 F.3d at 464. Of course, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Id.* But "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[] *on the face of the complaint*.'" *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)).

In *Goodman v. Praxair, Inc.*, the Fourth Circuit considered a district court's order dismissing a complaint on statute of limitations grounds. *Id.* at 463. The plaintiff, Goodman, alleged a breach of contract and a violation of the Maryland Wage Payment and Collection Act due to the breach of contract. *Id.* at 461–62. The defendants, successors in interest to the contract, moved to dismiss. *Id.* at 461. They asserted that the complaint was time-barred, and the district court agreed. *Id.* at 463. The Fourth Circuit reversed. *Id.* at 461. The *Goodman* Court explained that "[o]rdinarily, a defense based on the statute of limitations must be raised by the defendant

through an affirmative defense, and the burden of establishing the affirmative defense rests on the defendant." *Id.* at 464 (citing Fed. R. Civ. P. 8(c)). In Goodman's amended complaint, which he filed April 5, 2004, he alleged that on December 19, 2000, $620,000 became due on the contract in question. *Id.* He further alleged that the original party to the contract and its successors in interest had failed to pay. *Id.* But because Goodman had "allege[d] neither a date when the contract was breached" nor facts concerning when the payment was demanded or when the original party to the contract refused to pay, "it [wa]s impossible to infer from the complaint the date when the breach occurred." *Id.* at 464–65. Moreover, under Maryland's "discovery rule," the date that the action accrued (and thus the date that the limitations period began to run) was the date when "the plaintiff learned or should have learned of the breach." *Id.* at 465 (citing, *e.g.*, *Jones v. Hyatt Ins. Agency, Inc.*, 741 A.2d 1099, 1103–04 (Md. 1999)). Yet Goodman had not alleged when he discovered the breach. *Id.* Therefore, his "complaint also d[id] not provide facts sufficient to apply the discovery rule." *Id.* The court could not dismiss the complaint based on an affirmative defense. *Id.* at 466.

The *Goodman* Court rejected the defendants' argument that "because the discovery rule is an extension of the limitations period that Goodman must allege and prove in response to a statute of limitations defense, the risk of failing to make the showing must fall on Goodman, not on the [defendants]." *Id.* at 465. The court reasoned that, "[w]hile Goodman might ultimately have to *prove* when he discovered a breach, he was not obligated to plead discovery of the breach in his complaint when the affirmative defense had yet to be demonstrated in the complaint or asserted by the defendants." *Id.* at 465–66. Thus, if the defendants "wished to dispose of the complaint on its face *before* asserting their affirmative defense, on the ground that their affirmative defense was evident in the complaint, they had to show also that the plaintiff's potential rejoinder to the affirmative defense was foreclosed by the allegations in the complaint." *Id.* at 466. "To require

otherwise would require a plaintiff to plead affirmatively in his complaint matters that might be responsive to affirmative defenses even before the affirmative defenses are raised." *Id.* The Fourth Circuit affirmed that "no such pleading is required except, perhaps, in the unusual case where a claim is filed *clearly* beyond the applicable limitations period and the plaintiff seeks to forestall its dismissal by alleging the facts of discovery." *Id.*

Since *Goodman*, the Fourth Circuit and district courts have applied *Goodman* to affirmative defenses other than the statute of limitations, including preemption. *See, e.g.*, *L.N.P. v. Kijakazi*, 64 F.4th 577, 585–86 (4th Cir. 2023) (applying *Goodman* to exhaustion defense); *Franklin Livestock, Inc. v. Boehringer Ingelheim Vetmedica, Inc.*, 113 F. Supp. 3d 834, 837 (E.D.N.C. 2015) (applying *Goodman* to preemption defense); *Gilmore v. Bostic*, 636 F. Supp. 2d 496, 514 (S.D. W. Va. 2009) (applying *Goodman* to exhaustion defense under the Prison Litigation Reform Act); *cf. Mitchell v. Fed. Express Corp.*, No. DKC 16-3172, 2017 WL 3434111, at *2–3 (D. Md. Aug. 10, 2017) (citing *Goodman* and denying a motion to dismiss based on federal preemption because "[m]ore information [wa]s required" to determine if the claim was preempted).

*Goodman* applies here as well. Bayer seeks dismissal of Murphy's complaint on preemption grounds. "It is well established, of course, that preemption is an affirmative defense," and "[t]he burden of establishing preemption . . . is on the defendant[.]" *Burrell*, 918 F.3d at 382 n.3. "In this context, federal preemption occurs when it is 'impossible for a private party to comply with both state and federal requirements.'" *Knight v. Boehringer Ingelheim Pharms., Inc.*, 984 F.3d 329, 337 (4th Cir. 2021) (quoting *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 303 (2019)). In some cases, "federal law (including appropriate FDA actions) prohibit[s] the drug manufacturer from adding any and all warnings to the drug label that would satisfy state law." *Albrecht*, 587 U.S. at 313–14. The FDA's CBE regulation allows drug manufacturers "to change

a label without prior FDA approval if the change is designed to 'add or strengthen a . . . warning' where there is 'newly acquired information' about the 'evidence of a causal association' between the drug and a risk of harm." *Id.* at 305 (quoting 21 C.F.R. § 314.70(c)(6)(iii)(A)). Accordingly, "[a] state law challenge to FDA-approved warnings, including a tort action under state law, can . . . proceed only when the defendant had the unilateral ability to change that labeling; otherwise, the claim is preempted." *Knight*, 984 F.3d at 337. Still, "[i]mpossibility pre-emption is a demanding defense" for which the defendant bears the burden of proof. *See Wyeth v. Levine*, 555 U.S. 555, 569, 571, 573 (2009). And "plaintiffs . . . are not required to establish, nor to allege in their complaints, that their claims are *not* preempted." *Burrell*, 918 F.3d at 382 n.3.[3]

Thus, to prevail on a motion to dismiss, Bayer had to show that "all facts necessary to the affirmative defense 'clearly appear[] *on the face of the complaint*.'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250). This means that if Bayer "wished to dispose of the complaint on its face *before* asserting their affirmative defense, on the ground that their affirmative defense was

---

[3] Bayer argues that this language in *Burrell v. Bayer Corp.* is dicta because the issue before the court was whether the federal court had federal question jurisdiction over the plaintiffs' state failure-to-warn claims. This argument misses the broader context of the statement in *Burrell* and its relevance to this Court's ruling. For a court to have federal question jurisdiction under 28 U.S.C. § 1331, the federal question must be "a 'necessary element of one of the well-pleaded state claims,'" and "[i]t is *not* enough that federal law becomes relevant by virtue of a 'defense . . . anticipated in the plaintiff's complaint.'" *Burrell*, 918 F.3d at 381 (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 13–14 (1983)). The portion of *Burrell* that this Court cites reflects settled law that "a preemption is an affirmative defense for which the defendant bears the burden of proof—it is not an element of a state law claim. The Supreme Court has affirmed that Bayer bears the burden to prove a preemption defense in this context. *See Wyeth*, 555 U.S. at 573. And the *Burrell* Court's recognition that "plaintiffs . . . are not required to establish, nor to allege in their complaints, that their claims are *not* preempted" is consistent with *Goodman*'s holding that a plaintiff generally need not "plead affirmatively in his complaint matters that might be responsive to affirmative defenses even before the affirmative defenses are raised." 494 F.3d at 466. Bayer cannot avoid this result by labeling the cited language in *Burrell* as dicta.

evident in the complaint, they had to show also that the plaintiff's potential rejoinder to the affirmative defense was foreclosed by the allegations in the complaint." *See id.* at 466.

Murphy alleges facts that suggest her state law claims may be preempted by federal law. Her state law claims are predicated on Bayer's failure to update the Betaseron® label, and under federal law, Bayer cannot unilaterally "add or strengthen a . . . warning" on the physician label unless it has "newly acquired information" regarding "evidence of a causal association" between Betaseron® and a risk of harm. *See* 21 C.F.R. § 314.70(c)(6)(iii). Even so, not "all facts necessary to the affirmative defense 'clearly appear[] *on the face of the complaint*.'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250).

Murphy's "potential rejoinder" to Bayer's preemption defense is not "foreclosed by the allegations in the complaint." *Id.* at 466. Her potential rejoinder is that Bayer could unilaterally change the physician label without FDA approval because it had "newly acquired information" regarding "evidence of a causal association" between Betaseron® and a risk of harm. Her allegations do not foreclose that rejoinder. At the very least, they are entirely consistent with the existence of newly acquired information. For example, Murphy alleges that Betaseron® labels in other countries warn patients about the risk of nephrotic syndrome, including FSGS, and that post-marketing surveillance identified the risk of developing FSGS. ECF 1, ¶¶ 48–49. These allegations are consistent with Bayer having newly acquired information about the risk of renal dysfunction and disease associated with Betaseron®. These, and the rest of Murphy's allegations, do not "foreclose" her rejoinder to Bayer's preemption defense. Just as the complaint in *Goodman* did not "provide facts sufficient to apply the discovery rule"—a potential rejoinder to a statute of limitations defense—Murphy's complaint does not provide sufficient facts to determine whether Bayer could unilaterally change the Betaseron® physician's label without FDA approval—a

potential rejoinder to Bayer's preemption defense. *See Goodman*, 494 F.3d at 465. And just as Goodman "was not obligated to plead discovery of the breach in his complaint when the affirmative defense had yet to be demonstrated in the complaint or asserted by the defendants," Murphy is not obligated to plead the existence of newly acquired information to defeat a preemption defense that had not yet been demonstrated in her complaint or asserted by Bayer. *See id.* at 465–66.

A comparison of this case to the "relatively rare circumstances" described in *Goodman* is instructive. In *L.N.P. v. Kijakazi*, the Fourth Circuit determined that a plaintiff's complaint could be dismissed for failure to exhaust claims because the case presented the "relatively rare circumstances" where "all facts necessary to the affirmative defense clearly appear[ed] on the face of the complaint." 64 F.4th at 586 (quoting *Goodman*, 494 F.3d at 4. In *L.N.P.*, the plaintiff sued on behalf of himself, his dependent children, and a putative class to challenge the Social Security Administration's method of calculating auxiliary benefits for dependent children. *Id.* at 580. By statute, a party seeking judicial review of the Social Security Commissioner's "final decision" must exhaust administrative remedies, except in certain "exceptional circumstances, when the purposes of the administrative process have been fulfilled or when the Commissioner determines she has no power to grant the relief requested." *Id.* at 583–84 (citing 42 U.S.C. § 405(g)). The government moved to dismiss the complaint for failure to exhaust. *See id.* at 581. The plaintiff alleged in his complaint that he did not exhaust his administrative remedies and that "[a]ny requirement for exhaustion of administrative remedies should be excused in this case." *Id.* at 582. He also alleged several reasons why he was not required to exhaust his claims. *Id.* The Fourth Circuit applied *Goodman*. The court noted that "a Rule 12(b)(6) motion to dismiss, which addresses the sufficiency of the complaint, generally does not enable the court to determine

whether the exhaustion requirement has been satisfied or whether it has been waived or should be excused, because exhaustion is treated as an affirmative defense." *Id.* at 585. It reiterated that "[w]hen . . . 'facts sufficient to rule on an affirmative defense [such as exhaustion] are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6).'" *Id.* at 586 (second alteration in original) (quoting *Goodman*, 494 F.3d at 464). The court cautioned, however, that "this principle applies only in the 'relatively rare circumstances' when 'all facts necessary to the affirmative defense clearly appear on the face of the complaint'" and "the defendant [can] show 'that the plaintiff's potential [response] to the affirmative defense was foreclosed by the allegations in the complaint.'" *Id.* (second alteration in original) (quoting *Goodman*, 494 F.3d at 464).

The *L.N.P.* Court determined that "the *Goodman* exception applie[d] in this case." *Id.* Because the plaintiff had "alleged in great detail why his case was exceptional and why his circumstances satisfied all three conditions identified for a court to excuse exhaustion" and "argue[d] [in his brief on appeal] that 'the Complaint alleges sufficient facts to warrant waiver of exhaustion,'" the *L.N.P.* Court determined that "the merits of [the exhaustion] defense can be fully adjudicated by looking to the face of the complaint to determine whether [the plaintiff] would be able to justify excusing compliance with [the applicable] exhaustion requirement." *Id.*

The same cannot be said of Murphy's complaint. Unlike the plaintiff in *L.N.P.*, Murphy has not "alleged in great detail" that the CBE regulation applies and that her claim is not preempted; nor has she argued in briefing that she has met this requirement through the allegations of her complaint. Murphy has consistently maintained that she is not required to plead around Bayer's preemption defense. This is not a case where "the merits of [the] defense can be fully adjudicated by looking to the face of the complaint." *Id.* The CBE regulation permits Bayer to

unilaterally change the Betaseron® label under certain circumstances. The allegations of Murphy's complaint do not foreclose those circumstances—far from it.

In time, Murphy will have to reckon with the fact that "a state-law challenge to federally approved pharmaceutical warning labels may only proceed when the pharmaceutical company has the unilateral ability to change that labeling." *Knight*, 984 F.3d at 332. Under the CBE regulation, Bayer can unilaterally change the Betaseron® physician label if they have "newly acquired information" regarding "evidence of a causal association" between the drug and a risk of harm. 21 C.F.R. § 314.70(c)(6)(iii). So while the ultimate burden of proving preemption falls on Bayer, Murphy eventually will have to show the existence of newly acquired information to prevail on her failure-to-warn claims. *See id.* at 340 n.10. But under *Goodman*, even though Murphy ultimately will have to prove Bayer had newly acquired information that allowed Bayer to change Betaseron®'s physician label without FDA approval, she does not have to plead allegations in her complaint that would defeat Bayer's preemption defense. The *Goodman* Court recognized that, though the plaintiff "might ultimately have to *prove* when he discovered a breach" in order to avoid dismissal on statute of limitations grounds, "he was not obligated to plead discovery of the breach in his complaint when the affirmative defense had yet to be demonstrated in the complaint or asserted by the defendants." 494 F.3d at 465–66. So too here. Murphy does not have to plead newly acquired information, even if she must, at a later stage of the litigation, prove that Bayer had such information.[4]

---

[4] The *Goodman* Court described an exception to the rule that plaintiffs do not have to plead around an affirmative defense. In "the unusual case where a claim is filed *clearly* beyond the applicable limitations period," a plaintiff "perhaps" must "forestall its dismissal by alleging the facts of discovery." 494 F.3d at 466. In a footnote of its brief, Bayer cites to this language in support of its contention that Murphy was required to allege the existence of newly acquired information to survive a motion to dismiss. Bayer does not explain why this is the "unusual case" referred to in *Goodman*. It is not. The CBE regulation permits Bayer to unilaterally change the Betaseron® label

Bayer argues that the Fourth Circuit has not addressed whether a failure-to-warn plaintiff must plead that a drug manufacturer has newly acquired information in order to overcome preemption on a motion to dismiss. Bayer insists that the "clear weight of authority" says Murphy must allege newly acquired information. ECF 68-1, at 10. It cites out-of-circuit cases and decisions from other district courts in the Fourth Circuit in which courts expressly or impliedly held that plaintiffs alleging claims similar to Murphy's must allege newly acquired information. None of these cases is binding on this Court. *Goodman* is. And *Goodman* applies here. Under *Goodman*, the motion to dismiss must be denied.

The out-of-circuit cases that Bayer cites do not compel a different result. The First and Second Circuits have held that plaintiffs who assert failure-to-warn claims against manufacturers of FDA-approved drugs must plausibly allege the existence of newly acquired information. In *In re Celexa and Lexapro Marketing and Sales Practice Litigation*, the First Circuit affirmed dismissal of state-law claims that a prescription drug label misled consumers because the plaintiffs had not alleged the existence of newly acquired information that would allow the defendant to update the label without FDA approval. 779 F.3d 34, 41–42 (1st Cir. 2015). The court determined that "a necessary step in defeating [the defendant's] preemption defense is to establish that the complaint alleges a labeling deficiency that [the defendant] could have corrected using the CBE regulation," and it therefore "scrutinized the complaint itself to see if it might plausibly be read as

---

under certain circumstances. The allegations in Murphy's complaint do not suggest those circumstances are not present here. This not a case where a state-law claim is "*clearly*" preempted and thus would require Murphy to allege facts in response to an affirmative defense before it is raised. To find that Murphy's case is the "unusual case" just because Murphy has not so alleged would allow the exception in *Goodman* to swallow its general rule that "no such pleading is required." *Id.* at 466. Under *Goodman*, Murphy was not required to allege facts that show the existence of newly acquired information about the risks she contends should have been added to the Betaseron® label.

relying on 'newly acquired information' in contending that [the defendant] could have changed its label through the CBE procedures." *Id.* The court found that the complaint did not allege that the defendant had newly acquired information to support the label changes, and moreover, the plaintiffs "seem[ed] to concede this in their prayer for relief, as they ask the Court to 'direct[] [the defendant] to seek FDA approval of a new [drug] label.'" *See id.* at 42–43 (first and third alterations in original). Because the plaintiffs had not alleged that the defendant "could . . . independently change its label to read as it should have read in order to comply with [state] law," the court determined their claims were preempted by federal law. *Id.* at 43. Similarly, in *Gibbons v. Bristol-Myers Squibb Co.*, the Second Circuit found state products liability claims preempted at the motion-to-dismiss stage because the plaintiffs, who alleged that a medication's label did not contain sufficient warnings, had pleaded only "'conclusory and vague' allegations and d[id] not plausibly allege the existence of newly acquired information that could have justified Defendants' revising the [drug] label through the CBE regulation." 919 F.3d 699, 708 (2d Cir. 2019) (quoting *Fortner v. Bristol-Myers Squibb Co.*, No. 17CV1562, 2017 WL 3193928, at *3 (S.D.N.Y. July 26, 2017), *aff'd sub nom. Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699). The *Gibbons* Court held that "to state a claim for failure-to-warn that is not preempted by [federal law], a plaintiff must plead 'a labeling deficiency that [Defendants] could have corrected using the CBE regulation.'" *Id.* (second alteration in original) (quoting *In re Celexa*, 779 F.3d at 41).

The Fourth Circuit has not endorsed the holdings in *In re Celexa* or *Gibbons*. And the Supreme Court decisions cited in *In re Celexa* and *Gibbons*—*Wyeth v. Levine*, *PLIVA, Inc. v. Mensing*, and *Mutual Pharmaceutical Co. v. Bartlett*—do not articulate the pleading standard that the First and Second Circuits adopted for claims against a brand-name drug manufacturer like Bayer.

16

In *Wyeth v. Levine*, the Court upheld a jury verdict that Wyeth, a brand-name drug manufacturer, failed to adequately warn the plaintiff of risks associated with its product, rejecting Wyeth's bid to overturn the verdict on preemption grounds. 555 U.S. at 558–59. Wyeth argued "that it could have changed [the drug's] label only in response to new information that the FDA had not considered," and "that [the plaintiff] ha[d] not pointed to any such information concerning the [relevant] risks." *Id.* at 568. The Court explained that "Wyeth's argument misapprehends both the federal drug regulatory scheme *and its burden in establishing a pre-emption defense*." *Id.* at 569 (emphasis added). The Court emphasized that "it has remained a central premise of federal drug regulation that the manufacturer bears responsibility for the content of its label at all times." *Id.* at 570–71. "The record [wa]s limited concerning what newly acquired information Wyeth had or should have had about the [relevant] risks . . . because Wyeth did not argue before the trial court that such information was required for a CBE labeling change." *Id.* at 569. But at trial, the plaintiff had introduced evidence of "at least 20 incidents prior to her injury" resulting in similar adverse outcomes. *Id.* The Court concluded that "Wyeth could have analyzed the accumulating data and added a stronger warning about [the relevant risk]." *Id.* And while the FDA could reject a labeling change made after this analysis, the *Wyeth* Court held that "absent clear evidence that the FDA would not have approved a change to [the drug's] label, [the Court would] not conclude that it was impossible for Wyeth to comply with both federal and state requirements." *Id.* at 571. In ruling against Wyeth, the Court explained that "[i]mpossibility pre-emption is a demanding defense" and that Wyeth "failed to demonstrate that it was impossible for it to comply with both federal and

state requirements." *Id.* at 573.[5] *Wyeth* did not hold that a failure-to-warn plaintiff must allege newly acquired information in their complaint.

In *PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011), the Court held that failure-to-warn claims are preempted by federal law that prevents *generic* drug manufacturers from unilaterally changing drug labels. The Court distinguished between a brand-name drug manufacturer, like the manufacturer in *Wyeth*, and a generic drug manufacturer. 564 U.S. at 626. While a brand-name drug manufacturer may "'unilaterally strengthen its warning' without prior FDA approval," generic drug manufacturers were "prevented . . . from independently changing their generic drugs' safety labels," because "[f]ederal law . . . demanded that generic drug labels be the same at all times as the corresponding brand-name drug labels." *Id.* at 617–18 (quoting *Wyeth*, 555 U.S. at 573). Although generic manufacturers could request that the FDA "work toward strengthening the label that applies to both the generic and brand-name equivalent drug," it could not make such changes independently, and to fulfill the state-law duty at issue would require an actual change to the label. *See id.* at 616, 618–19. Thus, the state law claims were preempted by federal law. *Id.* at 624. The Supreme Court reached a similar result on common law failure-to-warn claims brought against a generic drug manufacturer in *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472, 480, 493 (2013).

These Supreme Court decisions did not set a new pleading standard for failure-to-warn claims against brand-name drug manufacturers, and they do not conflict with *Goodman*, *Burrell*,

---

[5] In a more recent case, the Supreme Court reaffirmed that the defendant has the burden of proving impossibility preemption in the prescription drug label context. *See Albrecht*, 587 U.S. at 313–14 ("The underlying question for this type of impossibility pre-emption defense is whether federal law (including appropriate FDA actions) prohibited the drug manufacturer from adding any and all warnings to the drug label that would satisfy state law. And, of course, in order to succeed with that defense *the manufacturer must show* that the answer to this question is yes." (emphasis added)).

or this Court's August 14, 2024 ruling. If anything, *Wyeth* bolsters this Court's reasoning because it confirms that Bayer, a brand-name drug manufacturer, bears the ultimate burden of proving the preemption defense.

Finally, the district court cases from the Fourth Circuit that Bayer identifies also do not change the Court's analysis. "A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (quoting 18 J. Moore *et al.*, Moore's Federal Practice § 134.02[1] [d], at 134–26 (3d ed. 2011)). The Court declines Bayer's invitation to follow the reasoning of these district courts in lieu of binding Fourth Circuit law.

\*     \*     \*

Bayer has not shown that the Court erred when it denied Bayer's motion to dismiss Murphy's complaint for failure to state a claim. The motion for reconsideration is denied.

### B. Request to Certify for Interlocutory Appeal

Bayer requests that the Court certify for interlocutory appeal its August 14, 2024 Order denying Bayer's motion to dismiss. Because Bayer has not shown "substantial ground for difference of opinion," the request to certify the Order for interlocutory appeal is denied.

The federal courts of appeals generally have jurisdiction over "final decisions of the district courts of the United States." 28 U.S.C. § 1291. However, a district court may certify an order for interlocutory appeal where "[(1)] such order involves a controlling question of law as to which there is substantial ground for difference of opinion and [(2)] an immediate appeal from the order may materially advance the ultimate termination of the litigation." *Id.* § 1292(b).

"[I]nterlocutory appeal is an exception to the general rule that appellate review must await final judgment . . . ." *Nutraceutical Corp. v. Lambert*, 586 U.S. 188, 196 (2019). The Fourth Circuit

"ha[s] cautioned 'that § 1292(b) should be used sparingly and thus that its requirements must be strictly construed.'" *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 340 (4th Cir. 2017) (quoting *Myles v. Laffitte*, 881 F.2d 125, 127 (4th Cir. 1989)). "The party moving for certification of an interlocutory order pursuant to § 1292(b) bears the burden of proving that the prospective appeal satisfies each of the statutory prerequisites for certification." *Boyd v. Coventry Health Care Inc.*, 828 F. Supp. 2d 809, 820 (D. Md. 2011).

Courts may find substantial ground for difference of opinion "[i]f 'controlling law is unclear.'" *Int'l Refugee Assistance Project v. Trump*, 404 F. Supp. 3d 946, 950 (D. Md. 2019) (quoting *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010)). There may be substantial ground for difference of opinion "where the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented." *Id.* (quoting *Couch*, 611 F.3d at 633). "[A] party's disagreement with the decision of the district court, no matter how strong, does not create substantial grounds." *Id.* Moreover, "[l]ack of unanimity among courts and a lack of relevant authority do not suffice." *Id.* (citations omitted).

Bayer has not shown there is substantial ground for difference of opinion. The settled law the Court must apply is clear. *Goodman*, an en banc decision of the Fourth Circuit, controls, and under *Goodman*, the Court had to deny Bayer's motion to dismiss Murphy's complaint. Bayer's disagreement with the Court's application of *Goodman*, "no matter how strong, does not create substantial grounds." *Id.* at 950. The First and Second Circuits' decisions would compel a different result here, but they are not binding, the Fourth Circuit has not adopted their positions, and they conflict with *Goodman*. As for the other district courts within our circuit, these cases do not suggest substantial ground for a difference of opinion either. None of them cites *Goodman* or applies its

holding that plaintiffs generally need not plead around affirmative defenses. *See Burgess v. Pfizer, Inc.*, No. 19-235, 2020 WL 1812010, at *3–4 & n.2 (E.D.N.C. Apr. 9, 2020); *Barry v. Novartis Pharm. Corp.*, No. 22-196, 2022 WL 2373452, at *8–9 (E.D. Va. June 30, 2022); *Dennis v. Bayer Healthcare Pharm. Inc.*, No. 18-491, 2020 WL 534307, at *5 n.2, *8 (W.D.N.C. Feb. 3, 2020); *Silver v. Bayer Healthcare Pharm.*, No. 19-3495, 2021 WL 4472857, at *9, *11–12 (D.S.C. Sep. 30, 2021); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 185 F. Supp. 3d 761, 768–71 (D.S.C. 2016). These decisions do not show that the controlling law is "unclear." *Goodman* is controlling law, and it is clear. The Court's application of this well-settled law to Bayer's motion to dismiss is not grounds for interlocutory appeal under § 1292(b).

## IV.    Conclusion

For the foregoing reasons, Bayer's motion for reconsideration is denied, and the Court declines to certify its August 14, 2024 Order for interlocutory appeal. A separate Order follows.


Date: April 1, 2025

Deborah L. Boardman
United States District Judge

21